## MOORE v. DeGUIRE.

District Court, S. D. New York.
April 23, 1940.

Mudge, Stern, Williams & Tucker, of New York City (Thomas C. McConnell, of Chicago, Ill., and Paul D. Miller, and Stuart H. Steinbrink, both of New York City, of counsel), for complainant.

Addison S. Pratt, of New York City, for defendant.

HULBERT, District Judge.

Plaintiff filed a Bill in Equity, before the Federal Rules of Civil Procedure became effective, to rescind a contract for the purchase and sale of certain shares of stock in the Ajax Hand Brake Company, an Illinois corporation, and for an accounting.

The complaint is a voluminous and loosely drawn document. Basically it alleges fraud, fraudulent representations, conspiracy and concealment of facts. Upon the trial plaintiff apparently determined to abandon that theory and presented proof, received without objection, upon which it was argued, that the defendant had been guilty of constructive fraud arising from a violation of a fiduciary relationship on the part of the defendant and Lee, as the plaintiff's agent.

The defendant's objections thereto are without merit in view of the liberal provisions of Rule 15(c) Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

Plaintiff's counsel has summarized the allegations of the complaint, upon this phase of the action, as follows:

"At and prior to his death, plaintiff's husband was President of Ajax. Defendant was an employee thereof, standing in a confidential and fiduciary relation to Ajax and to plaintiff (par. 5). Defendant was a close personal friend of plaintiff's husband, in whom both plaintiff and her husband had imposed trust and confidence (par. 7). Lee, who for many years prior to the death of plaintiff's husband, acted as his attorney (par. 8), thereafter represented plaintiff both individually and as Executrix of her husband's estate and was her trusted and confidential attorney and adviser (par. 9).

"After the death of plaintiff's husband, defendant was elected a director and President of Ajax and as its President and general manager dominated and controlled its business policies and affairs and had full and complete knowledge of its assets, good will and franchises, of the business conducted by it, and of the value of said assets and business (par. 15).

"Plaintiff, during her husband's lifetime, was never acquainted with the business and operations of the Company and had had no business experience whatever and was totally unfamiliar with the affairs of the Company at the time of her husband's death. She was advised by the defendant that he completely controlled the business of the Company and could take it away if he so desired, rendering her stock value-less, since the value of the stock depended solely upon his ability to sell the brakes produced by the Company and that he, defendant, could be trusted to do what was right by plaintiff and that if she would put her trust and confidence in him her stock interest would be protected in every way. (par. 19).

"Plaintiff placed her trust and confidence in defendant and in Lee and relied implicitly on them and upon the confidential relationship which they bore to her (par. 20). Defendant thereafter importuned the plaintiff to sell him her stock and, knowing that Lee was her attorney in whom she had great trust and confidence, defendant sought out and conspired with Lee to use his confidential relationship with plaintiff to induce her to sell her stock for a grossly inadequate consideration and on terms advantageous to defendant; and Lee and defendant personally conducted the negotiations with plaintiff which ultimately induced her to sell and transfer to defendant her said shares of stock (par. 22). Some time during 1935, defendant, knowing of the trust and confidence which plaintiff reposed in Lee, started negotiations with him to buy his stock in the Company and the stock of Bosworth and of the plaintiff, both of whom were represented in said negotiations by Lee. These negotiations were carried on continuously between Lee and defendant and were in large part without plaintiff's knowledge. Unknown to plaintiff Lee negotiated a sale of his stock for $30 a share in cash upon the understanding and agreement that he would negotiate for defendant a purchase of plaintiff's stock on an instalment basis at a price of $5 a share less; and pursuant to this understanding Lee did so negotiate with plaintiff, but did not advise her that in order to obtain $30 a share for his stock, he had to obtain her signature to a contract of sale for $25 a share. Having the utmost confidence in Lee and believing she was helpless to do anything on her own behalf and that Lee had negotiated on her behalf to the best of his ability, plaintiff entered into a contract (the contract here sought to be rescinded) which Lee prepared in accordance with the wishes and instructions of defendant, whereby she agreed to sell her stock at $5 a share less than that obtained by her attorney for himself and for his other client Bosworth (par. 27).

"At and prior to the time of the execution of said contract, plaintiff had no knowledge of the value of the assets or the earnings of the Company and had no knowledge of the terms of the negotiations between defendant and Lee for the sale of the latter's stock to defendant (par. 31).

"Defendant, exercising a position of dominance and control and of trust and confidence, and utilizing the trust and confidence which plaintiff reposed in her attorney Lee, negotiated through Lee as his secret agent for the purchase of her stock, holding out to Lee the inducement of $5 a share more for his stock in the event that her signature to the contract was procured (par. 40).

"Plaintiff was subjected to constant solicitation from Lee to execute said contract. In negotiating and drafting said contract Lee was in fact acting as the secret and undisclosed agent of defendant; and defendant and Lee failed to disclose to plaintiff the fact that defendant would not purchase Lee's stock unless and until he could purchase plaintiff's stock at a substantially lower price than that offered to Lee (par. 40). Plaintiff had no independent representation in the negotiations of said contract, but the same was negotiated by defendant through the undisclosed agency of Lee, an attorney supposedly representing Bosworth and plaintiff, to defendant's knowledge, and while so representing plaintiff, Lee negotiated, with the complete knowledge and acquiescence of defendant, for a sale of his own stock at a higher price than that offered for plaintiff's stock and, unknown to plaintiff, the sale of Lee's shares at said higher price was contingent on Lee's successfully negotiating the aforementioned contract with plaintiff (par. 42)."

Then follow formal allegations of recision and tender (pars. 43, 44), in conformity with which the plaintiff testified that she was ready, willing and able to pay any monies that would be due the defendant in the event the contract was rescinded.

The trial has been an unnecessarily protracted one. The record contains a great

deal of repetitious matter. Elaborate briefs and reply briefs have been submitted by counsel. It seems desirable, in disposing of this litigation, to state the facts at some length.

The plaintiff is a resident of the City of Chicago, State of Illinois. After a course in stenography in a Chicago business college about 1903 or 1904 she became secretary to Mr. Charles B. Moore, who was then employed by the American Locomotive Equipment Company. A year and a half or two years later she and Mr. Moore were married and she took up her duties as a housewife. Two children were the issue of that marriage, Jamie and Robert.

Charles B. Moore, John H. S. Lee and Charles Bosworth were mutual friends of long standing. Mr. Moore and Mr. Lee had been fellow students at Lake Forest College. Later, Lee took a law course at Harvard University and was admitted to the bar in Chicago in 1898. He served as assistant State's Attorney, Professor of Law at Northwestern University, Chairman of the Board of Trustees of Lake Forest College, Member of the Chicago Crime Commission, Chairman of the committee on Character and Fitness of the Bar Association, and acted as attorney for Mr. Moore over a period of years. Charles Bosworth was also a member of the bar and had been receiver and President of a railroad, President of the Federal Reserve Bank in Chicago and President of the Peoples Bank in Chicago. In 1919, Mr. Moore and Garr Scadin made a contract with one Klasing for the exploitation of a brake to be employed on railroad freight cars. Lee and Bosworth advanced money to Moore in connection with the formation of the Klasing Brake Company. The enterprise, however, was not a success.

George N. DeGuire, who is a resident of this District, had been employed as a fireman on the Chicago & Northwestern Railroad for 3 years, as an engineer on that railroad for 10 years, and, having passed a Civil Service Examination, was appointed to the Bureau of Locomotive Equipment of the Interstate Commerce Commission in 1916. Two years later he was transferred to the U. S. Railroad Administration as general supervisor of equipment, and was later made assistant manager. He had charge of a group of 65 men in the field and took care of all matters relating to equipment, building repairs and maintenance so far as freight equipment, locomotives, cars, floating equipment, roundhouses, engine-houses and shops were concerned. When the affairs of the U. S. Railroad Administration were wound up he handled the liquidation of claims. In 1902 he joined the Brotherhood of Locomotive Firemen & Engineers and thereafter became a member of its Board of Directors. In 1924 he joined the Brotherhood Investment Company, owned by that Union. A few months later he went to Chicago and made a connection with the Locomotive Firebox Company as Assistant to President Carr, and while so employed, through R. W. Williams, Superintendant of Motor Power of the Pere Marquette Railroad, he met Mr. Moore who was then connected with Oxweld Railroad Supply Company, and one or two other railroad supply concerns.

DeGuire testified that Moore at that time told him he was about ready to turn back the Klasing patents and the agreement he had with Mr. Klasing in connection with the sale of his brake which was not marketable and had proved a failure, and intended to start another brake company to manufacture and sell a vertical wheel brake to be used on all classes of freight equipment, caboose, baggage and express cars. The Ajax Hand Brake Company was formed accordingly. It was the first to put a vertical brake on the market and at the time of the trial there were 307,000 Ajax brakes in service.

Lee, acting for Moore, incorporated the Ajax Hand Brake Company with a capital of 1,000 shares of the par value of $5 each, increased in 1931 to 10 for 1.

It is the contention of the defendant that the original stock was to be divided between Moore and himself on an equal basis, but from letters written by the defendant to Moore and produced by the plaintiff, I am satisfied there was no such definite understanding but that Mr. Moore did regard Mr. DeGuire as a person of experience who would be valuable to him in building up this prospective business and intended to treat fairly with him. In any event, after the formation of the Ajax Company, DeGuire was employed as a salesman and allotted the territory "East of Chicago." He worked on a purely commission basis and appears to have been efficient and effective in the discharge of his duties.

Mr. Moore became the President and Treasurer of the corporation and was in

sole and complete control of the management of its affairs. In 1927 he issued a certificate for 250 shares of stock of the Ajax Company to DeGuire without the payment of any cash consideration therefor.

In June of 1929, Mr. Moore became ill; he was partially paralyzed and confined to his home; he died Nov. 9th of that year. During his illness DeGuire was elected Executive Vice President but Mrs. Ayers, who had been an office employee practically since the inception of the Company, supervised the conduct of its business in the office. When it became too difficult for Mr. Moore to sign checks, Mrs. Moore was appointed Assistant Treasurer by appropriate resolution of the Board of Directors.

Prior to the death of Mr. Moore, Mr. Bosworth had made a claim for the monies which he had theretofore advanced to Mr. Moore. Mrs. Moore testified that she had been informed by Mr. Beymer, an employee of the Company, that Mr. Moore had taken this matter up with an attorney in Chicago, by the name of Crowe.

Mr. DeGuire had also written a letter to Mr. Moore urging the issuance of the balance of the shares of stock which DeGuire claimed were due him and the preparation and execution of an agreement to protect the interest of both in the event of the death of either.

Under the last will and testament of Mr. Moore, the plaintiff was the sole executrix and sole beneficiary. She retained Mr. Lee as attorney to probate the will and settle the estate.

It is claimed by Mr. DeGuire that he asked Mrs. Moore, if she decided to dispose of her stock, would she give him the first opportunity to purchase it and was assured by her that she would; that he never had access to the books of Ajax and did not know until after the death of Mr. Moore that the remaining 750 shares of stock of the corporation had been issued in the name of and were held by Mr. Moore. It is also claimed by DeGuire that when he did get access to the books he discovered that Mr. and Mrs. Moore had improperly withdrawn funds of the corporation in excess of $100,000 and that his interest as a stockholder had thereupon been impaired to the extent of 25% thereof; that he insisted upon the return of this money to the corporation. He also pressed his claim for an additional 250 shares of stock.

Mrs. Moore consulted Mr. Crowe and Mr. Lee regarding the claim of Mr. Bosworth, as well as Mr. DeGuire. Mr. Lee informed her that he could not advise her as he also had a claim for monies advanced to Mr. Moore. Mr. Crowe informed her that these claims were not legally enforceable.

It appears from the testimony of Walter S. Carr, President of the Locomotive Firebox Company, that he and his brother had for some time been considering the acquisition of an interest in the Ajax Hand Brake Company, with which they were familiar because of Mr. DeGuire's association with them, and Mr. Carr asked Mr. Lee if Mrs. Moore had ever considered selling her stock.

Mrs. Moore consulted Judge Matchette of Chicago, whose wife was a distant relative of Mr. Moore. The relationship between the families was one of close friendship. The Judge conferred with Mr. Lee and there was thus brought to his attention:

1. The claims of DeGuire, Bosworth and Lee (the latter had stated that he would never bring suit but that the attorney for Bosworth had indicated that he would call him as a witness which would be embarrassing).

2. The desire of Mr. Carr to acquire Mrs. Moore's stock.

It also appears that the settlement of these claims was pertinent to the negotiation for the sale of Mrs. Moore's stock to Mr. Carr.

A further meeting (which Mrs. Moore did not attend) was held at the University Club in Chicago between the Judge, Mr. Lee, Mr. Miller, counsel for Bosworth, who was on a trip around the world, and Mr. DeGuire. At this conference the claims of DeGuire, Bosworth and Lee were compromised by an agreement in writing approved by the Judge dated Jan. 31, 1930, and executed by all of the parties, including Mrs. Moore, whereby Mr. DeGuire's claim against Mrs. Moore and the estate of her husband was extinguished by the transfer to him by Mrs. Moore of 150 additional shares of stock of the Ajax Company, together with certain shares of stock of the Pennroad Company delivered to him by the Ajax Company at a stipulated value of $26,000 which was credited to "back salary due to Mr. DeGuire." DeGuire in turn released the Company, Mrs. Moore and the estate of her husband from the withdrawals

alleged to have been made by Mr. Moore in his lifetime and Mrs. Moore, and certain adjustments were made in the books by Mrs. Ayers accordingly. Shares of stock of the Ajax Company were also transferred to Mr. Bosworth and Mr. Lee.

Mr. Carr participated in this conference and a written agreement, approved by the Judge, was made and executed by Mr. Carr, and thereafter by Mrs. Moore, whereby she gave him an option on the purchase of her Ajax stock for $150,000, the Locomotive Firebox Company to give notes, with collateral, payable over a period of three years. Mrs. Moore had the privilege of having an audit made of the books of the Locomotive Firebox Company. Mr. Lee thereupon left for Florida and the Judge, acting for Mrs. Moore, made inquiry through his bank and Silas Strawn, Esq., a prominent Chicago attorney who had had some professional dealings with the Locomotive Firebox Company, and satisfied himself as to its financial responsibility. But meanwhile, a Mr. McWilliams, President of the Youngstown Steel Door Company, in which Mr. Moore at the time of his death was a substantial stockholder, had communicated with the Judge and offered to buy the stock of Mrs. Moore at the same price at which she had given an option to Mr. Carr to purchase it, and to pay cash. Although Mr. Carr gave notice to Mrs. Moore of his election to exercise his option, no steps were taken to make an audit of the books of the Locomotive Firebox Company, and after some delay, Mr. Carr became impatient and called the deal off, to the satisfaction of Mrs. Moore and the Judge. The negotiations with Mr. McWilliams, however, did not materialize.

Following the settlement of claims January 31, 1930, Mrs. Moore, Mr. Bosworth and Mr. DeGuire were elected directors of Ajax. Mr. DeGuire was chosen President, Mr. Bosworth Treasurer, and DeGuire continued in the general management of the business of the Company, without salary, but upon substantially the same commission basis as had theretofore been determined upon by Mr. Moore in his lifetime. Mr. DeGuire and Mrs. Moore rarely saw each other and then only at meetings of stockholders and directors. In the month of January, 1935, Mrs. Moore resigned as a director and her son Robert, who was then studying law at Northwestern University was, at her request, elected as her successor.

In 1931, the estate of Charles B. Moore having been closed, Mr. Lee wrote Mrs. Moore: "With respect to my fee for representing the estate, our understanding is that you will pay me $10,000 cash and agree to pay me 5% of any sum which you may receive from all of your shares of stock in Ajax Hand Brake Company up to the sum of five thousand dollars ($5,-000.00)".

This was agreed to and the payment of $10,000 was made.

Monthly and annual statements of the Ajax Company were prepared and furnished the directors, together with a quarterly statement of orders received for brakes and deliveries made.

Nothing of serious consequence so far as this case is concerned occurred until July 26, 1935, when DeGuire addressed a letter to Bosworth, Lee, Ludlow (a minor stockholder) and Robert Moore in which he outlined business conditions, and in closing said: "I wish to say I was approached a short time ago by the President of a railroad supply company asking if our stock holders would consider selling control of the Ajax Hand Brake Company. I advised the party in question that I had nothing to indicate that a move of this kind would be looked upon with favor by our stockholders."

On August 29, 1935, Mr. Lee wrote to Mr. DeGuire:

"You will remember that we talked over the question of your having control of the Ajax Hand Brake Company through ownership of a majority of its stock shortly after Charlie's death and found that it was impossible all along the line to put such a proposition through, and I do not see that the situation has changed since that time. You know the position of Mr. Bosworth and myself. As I told you, we put around $80,000 cash into the proposition, Mr. Bosworth's understanding with Charlie being that we were to receive an interest in the stock of the Ajax Company proportionate to the percentage that our cash investment bore to the entire cash invested. Finally, however, we took a comparatively small interest in the company, and, as you know, have never received a penny in dividends therefor.

"Our appreciation of your efforts and the results obtained have always been such that neither Mr. Bosworth nor I have ever talked with any one about disposing of the Ajax Brake or our interest therein, al-

though on more than one occasion the matter has been broached. In this connection, would you be favorable to making a proposition to outside interests to take over our company? For instance, supposing we made a proposition that we would keep and retain the cash in the treasury for distribution among the stockholders and sell our stock interests for a certain sum, either cash or half cash with the balance represented by notes payable say in one and two years. If you will tell me what sum you would be willing to agree upon along these lines I shall be glad to immediately take the matter up with Mrs. Moore and Mr. Bosworth and see what can be done, as I personally am loath to go ahead along the present lines if you feel dissatisfied.

"In this connection, I haven't spoken to Mrs. Moore about this or about the affairs of the Ajax Hand Brake Company for over a year."

On November 6, 1935, a meeting of the Board of Directors of Ajax was held in Chicago. On the preceding day Mr. DeGuire had a conference with Mr. Lee and Mr. Bosworth. The chief topic of discussion was the declaration of a dividend of $2 per share which Mr. DeGuire opposed upon the ground that the available cash was only $24,000 and it was necessary to have this working capital available particularly in view of certain patent litigations then pending. At the meeting of the Board of Directors the next day, Robert Moore joined Mr. Bosworth and Mr. Lee in urging the declaration of a $2 dividend. According to the testimony of Robert Moore, Mr. Bosworth said he had looked into the matter and felt that the Company could well stand a dividend of $2 per share and Mr. Lee felt the same way. After some discussion a $1 dividend was agreed upon and Mr. DeGuire said he would have the minutes prepared accordingly.

Mr. DeGuire also stated that he had taken it upon himself to discontinue sending around monthly financial statements as there were certain people he did not want to have see them and asserted that when he received the inquiry indicated in his letter of July 26, that Mr. Poor, whom he identified as the person who had approached him, disclosed a knowledge of the financial affairs of the Company which he thought had been gained through that source. Of course the financial statements, as well as the books, were available to the Directors at the office of the Company in Chicago.

Mr. Lee testified that sometime between Sept. 4, and November 5, 1935, he had a talk with Mrs. Moore concerning DeGuire's letter of July 26, 1935, and his letter of August 29, and that upon that occasion Mrs. Moore had expressed her willingness to accept $25 per share for her stock. This she vigorously denies and I think Mr. Lee evidently confused this with a later occasion. Her son, Robert, testified that he had never heard anything about the sale of his mother's stock until the meeting of November 6, 1935, at the conclusion of which DeGuire asked him if he 'knew whether his mother would be interested in selling her stock and he replied that Mr. DeGuire should take the matter up with Mr. Lee. The version given by both DeGuire and Lee is that, following the disposition of the question with respect to the dividend, the willingness of the parties to sell their stock for $30 per share came up and Mr. Lee stated he would prepare an offer in writing to that effect.

On the evening of Nov. 8, 1935, Mr. Lee called on Mr. Bosworth and at his dictation wrote:

"John H. S. Lee, Esq:

"Dear John: As I told you, I am willing to sell my Ajax Hand Brake shares at $30 per share, but not for less, provided you and Mrs. Moore also sell. I am willing to accept ½ in cash and the balance in one and two years, secured by Mr. DeGuire's notes drawing 6% interest, secured by my shares, providing also that Mrs. Moore does likewise.

"If sale is made before the payment of the dividend recently declared, I am willing the dividend to me be applied on the cash payment, provided also that Mrs. Moore agrees to this.

"The agreement must provide that no dividends shall be declared or paid and no salaries paid (other than those now being paid) until the notes are paid.

"I have no objection to your receiving the purchase price of your shares in cash."

Mr. Bosworth thereupon affixed his signature thereto.

Mr. Lee then called at the home of Mrs. Moore and had a conference with her in the presence of both of her sons. Robert testified that Mr. Lee stated DeGuire had been approached by an executive of a railroad supply concern in reference to buying all of the Ajax stock and asked his mother if she knew DeGuire was also interested in

purchasing it. She stated Robert had told her that DeGuire had come to him after the meeting (which Mr. Lee also confirmed) and that she had then asked Lee whether in his opinion it was a good time to even think about selling the stock, and Mr. Lee replied:

"Yes, I will give you several reasons why. First of all, if your husband were living or either of your sons were active in the company I would feel entirely different about the matter because I would feel that our interests could be protected in the way they should be protected. As it is I think it is better to get out of the company."

And further stated:

"You know the Ajax Brake Company has only declared one dividend in its history and that is the last dollar dividend. As a matter of fact, that was awfully hard to get and Robert knows how hard we fought for that one. You know I have told you in the past I have never favored the way in which Mr. DeGuire has curried favor with the purchasing agents of the railroads in connection with the Ajax Hand Brake Company business. It might possibly get us all into trouble some day."

"Well, Mrs. Moore, I have taken this up with Mr. Bosworth and he and I have discussed it pretty carefully and we have come to the conclusion that $30 is a fair price for the stock."

Robert further testified that his mother then told Mr. Lee she would be willing to sell at that figure, and Mr. Lee said: "Well, in that case I will need some authorization from you in writing to that effect" whereupon Mrs. Moore went over to the writing desk and added at the bottom of the letter signed by Mr. Bosworth:

"Dear Mr. Lee: You may make an agreement to sell my 40% of the stock of Ajax Company for the price (i. e. $120,-000) and upon the terms set forth by Mr. Bosworth above, only, however, if you also agree to sell your shares at the same price per share.", and affixed her signature thereto.

Mr. Lee controverts the testimony of Robert and Mrs. Moore referring to the preparation of the authorization signed by Bosworth stating that its purpose was to present a united front to Mr. DeGuire. However, that may be, the authorization was given or sent to DeGuire, and, on Nov. 14, 1935, in a letter to Mr. Lee, from New York, he wrote: "Since my return here I have continued to give the matter my best thought and have concluded, taking all things into consideration, that $25.00 per share is the maximum price I can pay for the Ajax stock held by you, Mrs. Moore and Mr. Bosworth."

DeGuire attached thereto a statement of the Ajax Company purporting to show assets over liabilities in the sum of $145,593.-20, equivalent to $14.56 per share, and another statement of "quick assets" over liabilities setting forth $90,737.49, equivalent to approximately $9 per share, and then continued: "Therefore, the price I have offered of $25.00 per share still leaves a margin of over $10.00 per share to cover Goodwill, etc."

He also wrote he had sufficient assurance from his bank to make it possible to pay Mr. Lee in cash, $50,000 in cash to Mrs. Moore $12,312.50 in cash to Mr. Bosworth; the balance to be covered by notes payable within a period of three years with interest at 6%, the dividend of $1 previously declared to be "applied on the cash payment."

Upon receipt of this letter Mr. Lee had another conference with Mrs. Moore in the presence of her two sons on the evening of Nov. 16th, 1935 and told her that Mr. Bosworth was not at all interested and she directed Mr. Lee to turn the offer down, and he so advised DeGuire.

Mr. Lee also took up with Mr. Bosworth and Mrs. Moore a claim which DeGuire had made for back salary amounting to $60,000 and notified him that they were opposed to it.

On November 25, 1935, Mr. Lee came to New York in connection with one or more patent suits against the Company and while in this City saw Mr. DeGuire, who, on that occasion, referred to his contention that he had been promised 50% of the stock of the Company by Mr. Moore; that the earnings of the Company had depended upon him since 1925, and that all of the money which Mr. and Mrs. Moore had improperly drawn out of the Company had not been put back. It is also contended by DeGuire that he had compromised with Mrs. Moore in 1930 in the expectation that Mr. Carr, with whom he was associated, would acquire her stock and that to acquire control of the Company in 1935 would necessitate the purchase by DeGuire of stock which, he insisted, whether justifiably or not, he should have received from Mr. Moore, or his estate, and he would not under the circum-

stances pay to the plaintiff any more than $25 per share. As Mr. Lee was leaving, DeGuire handed him a sealed envelope containing a proposal, the purport of which was to pay Mrs. Moore $36,000 (taking credit for the $1 dividend) and issue to her 600 shares of preferred stock (and 200 shares to Mr. Bosworth). Upon his return to Chicago, Mr. Lee had another conference with Mrs. Moore in the presence of her two sons on November 29, 1935. He told her he had taken up the preferred stock proposal with Mr. Bosworth and he would not even consider it, and that he (Lee) did not think it was a good proposition. Mrs. Moore and her sons agreed with him and that offer was turned down, DeGuire being so advised by letter dated December 2, 1935, in which Mr. Lee said:

"When I was in New York you said that you could understand the position of Mr. Bosworth and myself in insisting upon $30.00 a share, but believed that your offer to Mrs. Moore of $25.00 should be acceptable to her. At that time you went into quite a detailed statement of the situation upon which you based your position, pointing out the figures which you believed supported the same.

"This difference between your proposal to Mr. Bosworth and myself and Mrs. Moore appears likewise in the statement that you handed to me just as I was leaving for the train last Wednesday. I did not go over this with Mrs. Moore or her sons, however, because, as I suggested, she wasn't interested in taking Preferred stock, for the reasons suggested."

(Both Mrs. Moore and Mr. Bosworth believed that the earnings would be greater than dividends on the preferred stock and both said they would each prefer to be all in or all out.)

"I, therefore, gave up, but during Sunday have thought of a last possible chance to get together, namely: If, instead of paying by Preferred stock, you will offer Mr. Bosworth and me $30.00 a share and Mrs. Moore $25.00 a share under conditions such that the cash payment provided for in your offer of November 14th shall not be increased and your payments by notes in one, two and three years will only be increased $3111.17 each year, and will state in a kindly way the reasons which you gave me in New York for believing that a payment of $25.00 per share to Mrs. Moore is fair so far as she is concerned, I will take the matter up with her, her sons and Mr. Bos-

worth and finally settle the situation one way or the other."

Mr. Lee then sets forth a comparison of the proposal of November 14, 1935 and the new proposal suggested by him, and continues:

"I have said nothing about this proposal to Mrs. Moore, as it is useless to annoy her with further suggestions unless we could close on the proposal without delay if she should accept the same. If she refuses, we will let further negotiations drop.

"Both Mr. Bosworth and Mrs. Moore have agreed that if they do not close with you and should hereafter dispose of their stock they will use their best efforts to try to get you the same offer for your stock as they receive for theirs, but can not agree to be bound further than this. I will agree to this same thing."

On Dec. 6, 1935 Mr. DeGuire wrote Mr. Lee from New York:

"I have gone over your new proposal carefully and if you will again read my letter to you of Nov. 29th you will find that such proposal leaves me with my hands completely tied and unable to move, therefore, I cannot accept the same.

\*   \*   \*   \*   \*   \*

"In considering the above matter will you not please weigh and have our other folks do likewise, our situation in 1932. At that time Carbide stock was selling below $20.00 a share. I bought all I could handle which was 160 shares at $20.00. I wanted very much to take the $10,000 of my money out of the Ajax treasury and buy 500 additional shares at $20.00 per share but to do this would have resulted in closing up the Company unless our stockholders all came forward and advanced cash to keep it going. If I had bought the 500 shares of Carbide I would now have a profit of $26,000. This is a real loss to me incurred to keep the Company in working condition. The Company on the other hand, you will recall, compensated Charlie Moore for every dollar of his loss on Carbide stock, said adjustment being made to Mrs. Moore following his death in 1929.

"In addition to this I have served from 1930 to 1935 as President of the Company without compensation. Charlie Moore rendered similar service without compensation from 1926 to 1929 inclusive, but the Company, however, in making adjustments with Mrs. Moore paid for those years of service in full. As a matter of fact, on Charlie

Moore's stock losses and in payment of his salary, etc. the Company made allowance to Mrs. Moore of approximately $104,000.00.

"I sincerely hope now that I am in a similar position on some items to that in which Mrs. Moore found herself after Charlie's death in 1929 you and our other stockholders will weigh these facts at this time and give them consideration in any settlement that may be reached."

Mr. Lee next saw Mrs. Moore and her two sons at her home following the receipt of this letter and stated that DeGuire had turned down or withdrawn all proposals and there was no offer open either way. He further stated DeGuire was expected in Chicago very shortly and it would be better to let the matter rest meanwhile.

On Dec. 11, 1935, Mr. Lee wrote DeGuire (and forwarded copy, with letter of transmittal on the same day to Mrs. Moore):

"Mrs. Moore, you, Mr. Bosworth and I settled all questions between us some years ago. Since that date, quite apart from the question of what we invested, neither Mr. Bosworth nor I have ever taken the position that there was anything due to us because of facts arising before the settlement. I can not see why this does not apply to you with equal force. However, you have lately seemed dissatisfied, in my talks with you, about your share of the proceeds from the company, and the thought has therefore occurred to me that it would be better all around if we could make some settlement avoiding all possible friction. I have felt that you should have the first chance to buy our stock if we decided to sell. You are quite right in assuming that there is no offer on your part open, as we all turned down your offer of $25.00 a share, and for such reason I do not know that Mrs. Moore would accept an offer along the lines suggested in my letter, but told you that I would be glad to lay the entire matter before her and her sons and let them finally decide the matter for themselves.

"If something very closely approximating that suggestion is not acceptable to you, won't you kindly let me know what you would take, first, in all cash, and second, in Preferred stock, for your holdings? I haven't the slightest wish to hurry you, but would like, for several reasons, to come to some final decision in the matter without undue delay."

On Wednesday, Dec. 18, 1935, Mr. Lee was again in New York on patent matters connected with the Company and saw Mr. DeGuire.

In a letter to Mr. Lee dated Dec. 21, 1935, DeGuire proposed to pay $150,000 for all of the outstanding 6,000 shares of stock; one-half in cash less $1 dividend previously declared, the balance in notes over a period of four years, except that Mr. Lee should be paid in cash in full.

Upon receipt of this letter Mr. Lee had a talk with Mrs. Moore and her two sons and stated that DeGuire had offered $25 per share and no personal liability on the notes; that he had also taken the matter up again with Bosworth, who was not at all interested, and, as Mrs. Moore and her sons did not care to accept that proposition either, it was turned down. Mr. Lee wrote DeGuire the next day (Dec. 23rd) that copies of his letter of Dec. 21st had been delivered to Mr. Bosworth and Mrs. Moore, and said:

"I did not take up with Moore the question whether or not under the circumstances that you have referred to often she would be willing to take $25.00 a share, because of the fact that both Robert and she took substantially the same position as Mr. Bosworth had taken about notes; in other words, that you would have complete control of the corporation and that it would be practically impossible to protect themselves unless they had your personal obligation. You cannot be surprised at this, because I told you that unless I could submit for consideration the proposal contained in my letter of December 2nd I felt sure that it would be impossible to come to a conclusion. You will remember that that suggestion was only $9333.50 more than your prior proposal which they had turned down. Whether Mrs. Moore would agree to that I do not know, but I was willing to go into the matter carefully with her. I did not take up the question of the five per cent interest instead of six per cent or the question of the notes for four years instead of three with either Mr. Bosworth or Mrs. Moore, as it was useless to go further with them on the proposition in view of your position.

"Unless, therefore, you can authorize me to go to Mr. Bosworth and Mrs. Moore with such a proposition as I suggested on December 2nd, with possibly some slight modifications, such as that the interest rate be reduced from six per cent to five per cent, we will have to call the matter closed. If you ever want to buy the stock of Ajax

Brake, now is the time to do it, as I feel confident that in the future no such opportunity will offer.

"P.S. I did not, of course, speak to Mr. Ludlow, because under the circumstances it was useless to so do."

On the morning of Dec. 26, 1935, Mr. DeGuire called Mr. Lee on the long distance telephone, following which Mr. Lee mailed a letter to Mrs. Moore, in which he wrote:

"This morning he (DeGuire) called me over the 'phone and said that in an attempt to reach a final agreement he was willing to accept the new proposal which I tentatively set out on page 2 of my letter of December 2nd, a copy of which you have. He added that his sole reason for not offering to sign the notes personally was that his Bank of which he is going to borrow the money to make the cash payment did not want him to become personally obligated for the $71,646. He added that he did not intend to do anything as Mr. Bosworth had suggested to me he might do, and was willing to guarantee it by the following, namely: That no additional stock would be issued until all the notes were paid; that no commissions would be paid greater than as at present unless additional roads were taken on, in which case the commissions would not be larger than those now paid; that no salary would be paid to him until the notes were all paid; that any dividends declared on any stock would be applied on the notes for which the stock was held as collateral; that you and Mr. Bosworth would have representation on the Board of Trustees until the notes were paid. Mr. DeGuire had also sent me a letter with regard to his negotiations with the Pennsylvania Railway, a copy of which I will show to you this evening.

"I have not told Mr. Bosworth nor any one else that you and the boys suggested that you were willing to sell at $25.00 a share and have Mr. Bosworth and me receive $30.00. Of course, I understand perfectly that this is not for any of the reasons suggested by Mr. DeGuire, as we made a settlement in full of all questions, as you know, some years ago, and I know, both from the statements made by you to me and by Herbert (Moore, plaintiff's brother in law) to me that no promise was made to Mr. DeGuire of additional stock by Charles. I assume, although you have not said so, that probably your reason for being willing to agree to this is that you appreciate the fact that Mr. Bosworth and I wanted to sell at a very considerably higher price when the Carrs offered to purchase your stock for $150,000 and offered to purchase ours at the same rate several years ago. I refused to sell separately because of the fact that, as I have assured you, neither Mr. Bosworth nor I wish to dispose of our stock holdings and leave you a minority stockholder in the Ajax Brake. In view of the fact that I would be getting more than you and would be getting it in cash I would want you to consult some other good lawyer before accepting this proposition if it was acceptable and not be in any way influenced by me. In fact, I will refrain from making any recommendation in connection with the matter, and if you decide that it is for your best interests to hang on I am going to continue to hold my stock with you, so, as above suggested, not to leave you a minority stockholder, and I am sure that Mr. Bosworth will agree to the same thing. In fact, if we do not carry this proposition through with Mr. DeGuire, I think that we ought to draw up a short agreement, binding on us and our heirs, agreeing that if either of us obtains an offer for our stock, before selling we will get the same offer for the others or refuse to sell.

"I will try to drop over to your house this evening and see you, Robert and Jamie, and talk this over further."

There is a decided conflict between the version of Mrs. Moore and her son Robert on the one hand, and Mr. Lee on the other, as to what took place at that interview. Mrs. Moore testified that Lee told her he had negotiated considerably with DeGuire; that he had an offer of $30 per share for his and Bosworth's stock and not more than $25 per share for her stock and that she said: "Mr. Lee, why are you getting $30 and I am only getting $25? It is certainly unfair, I cannot understand it, and I am entitled to receive as much for my stock as you and Mr. Bosworth are to receive for yours;" that Mr. Lee replied he had done the best he could for her and that DeGuire would pay no more because he was not satisfied with the settlement that was made in January, 1930, and felt he should have received 50% of the stock at that time. Mrs. Moore further testified that Robert Moore spoke up and said:

"Mr. Lee that does not enter into the situation at all; that agreement was all settled and signed in January 1930" and Mr. Lee replied: "Well, that makes no dif-

ference, he will pay no more for your stock and I have done the best I can for you".

Mrs. Moore further testified she then said: "What would you advise me to do?" and Mr. Lee replied he would advise her to sell because he and Bosworth had decided to take $30 per share for their stock and they did not want to leave her a minority stockholder; that DeGuire had threatened during the progress of the negotiations to organize a new brake company and take away the business of the Ajax Company if he could not buy the stock at this time, and he then said:

"As you know, we have never received a dividend except the $1.00 dividend as long as we have been in the company. With DeGuire it will be the same story. I do not feel safe in the company because of the way DeGuire has dealt with the purchasing agents of the railroads; it may be subject to criticism and that is why I have told you many times I would not be a director in the company."

Mrs. Moore further testified Lee stated DeGuire was anxious to get it closed up because he was going away and Lee was anxious to get it closed up because he wanted to get his payment in his 1935 income, and that Mr. Lee added: "You remember when I advised you to sell your stock to the Carrs you did not follow my advice and the result was the deal fell through;" that Mr. Lee further told her the only thing for her to do was to sell because she might be left in the company alone with DeGuire; that Lee said: "If you wish, Mrs. Moore, you can call in another attorney to advise you and it is perfectly all right, but remember, when you got Judge Machette to advise you the deal fell through."

Thereupon, Mrs. Moore testified, she informed Mr. Lee that she had confidence in his judgment and he could tell DeGuire that she would agree to the proposition.

Robert Moore's testimony does not differ in any substantial particular from that of his mother.

· Mr. Lee testified that Mrs. Moore had his letter of December 26th in her hands during the conference and gave the following version of the conversation with her: "I went over to Mrs. Moore's and told her that Mr. DeGuire had called me up in the morning and had told me that he would accept the proposition that I had suggested on Dec. 2nd. I told her that he explained to me that the reason why he had—was not

signing the notes that he was proposing to give was because he had seen his Bank and the Bank did not want him to become obligated for a larger sum than his indebtedness to the Bank. I told her that he had agreed however to comply with the objections made by Mr. Bosworth, and I then stated that inasmuch as I was getting cash $30 a share and she was getting—and Bosworth was getting $30 a share—but notes, part cash and part notes—I thought that she ought to consult some independent lawyer who would give her advice and suggested Judge Matchette, and she said 'If I had not seen Judge Matchette in connection with that Carr matter it might not have fallen through' or 'would not have fallen through.' "

Mr. Lee continued: "Mrs. Moore I have seen Mr. Bosworth. I want you to talk this over with the boys and decide for yourself whether you want to take this; Mr. Bosworth has assured me that if you don't want to take this, we will stand by you and continue to hold our stock with you and not leave you a minority stockholder."

That Mrs. Moore then stated: "I am not concerned with the fact that you are getting $25—you are getting $30 and I am getting $25; the thing that bothers me is the fact that the notes are not signed by Mr. DeGuire".

And Mr. Lee replied: "That is true under the proposition that he makes; he is not signing the notes but he is proposing however to put up all of the stock that he buys from you as collateral security for the notes, and, of course, if he fails to pay the notes you will get whatever cash you are paid and you will get the stock back" and after she had talked it over with Robert and Jamie, she said: "This is not really a legal proposition it is a business proposition."

The fact is she did not consult another lawyer.

On Dec. 28, 1935 Mr. Lee wrote Mr. DeGuire: "Mrs. Moore and Mr. Bosworth have authorized me to accept the offer contained in your letter of December 26th as modified by your telegram" and that letter was "okayed" by Mr. Lee, Mr. Bosworth and Mrs. Moore.

Mr. Lee had telegraphed Mr. DeGuire to call him on long distance telephone at an appointed hour, and in confirmation of the conversation then held, DeGuire telegraphed Lee, Dec. 28, 1935: "Change in

time of notes from four to three years and retention of Board as at present until half of notes are paid accepted with the understanding that all other terms and conditions as incorporated in my proposition of December twenty first and as amended December twenty sixth will stand. Upon receipt this acceptance it is also my understanding that you will proceed immediately with the preparation of all necessary papers and that such work will be performed by you without salary commission or other compensation. Regardless this acceptance am still hopeful that you will be able to convince parties interested in agreeing to permit Board setup as suggested in my letter of December twenty sixth. Confirming."

This telegram was confirmed in a letter of that date in which, while assenting thereto, DeGuire expressed his regret that Mrs. Moore and Mr. Bosworth insisted on having the board of directors remain "as at present" until one-half of the notes were paid.

Mr. Lee prepared and forwarded the form of contract and notes to Mr. DeGuire under date of Jan. 4, 1936 to which was appended the following postscript: "There was no need of putting myself in as a party to the contract, as I will simply deliver to you my stock and you can make the payment."

Mr. DeGuire's attorney, Mr. Pratt, revised the contract and Mr. DeGuire took it with him to the meeting in Chicago on Jan. 16, 1936. At that meeting there were present, Mrs. Moore, Mr. DeGuire, Mr. Lee, Robert Moore and Mr. Bakke (bookkeeper of Ajax). Copies of the proposed contract were distributed and the original was read aloud, two amendments were suggested thereto, according to Mr. Bakke, by Robert Moore. Mr. DeGuire said he could not agree to them without conferring with his attorney. Mr. Lee suggested that he get Mr. Pratt on the long distance telephone, which he did, and Mr. Pratt approved of both proposed changes. The parties then repaired to the Harris Bank & Trust Company where the contract was executed, the payments made thereunder, and the notes and the stock as collateral were placed with the Bank in escrow.

The evidence in this case satisfies me that no fraud was perpetrated upon Mrs. Moore; that no information was concealed which either the defendant or Mr. Lee could be under any duty to reveal to her.

She had been, and her son succeeded her as, a director; the books of the Company were available to them, and annual, quarterly and monthly statements of the affairs of the Company were furnished them.

It is urged that the plaintiff is a housewife, without business training and experience. Yet, Judge Matchette said "She was a bright woman and she was familiar with the business that her husband was carrying on; that was the way it impressed me."

There are two exhibits which were important factors in my determination of the facts in this case. Exhibit "M" is a letter Mrs. Moore wrote to Mr. Lee under date of June 27, 1934, from which I quote:

"I received your letter this morning in regard to the Ajax proposition.

"I have several points I wish to bring up about the proposed plan of payments as set forth in the settlement offer to Mr. Nerney.

"As I understand the proposition, the initial payment of $4,000 constitutes a pro rata, immediate and personal obligation of each stockholder; the balance to constitute a debt against the Ajax Company and to be represented by the Company's notes payable, I believe, over a span of three or four years. Naturally, I desire to clarify this matter in my mind, because the giving of personal pro rata notes for the balance is obviously out of the question, and any agreement in the offer to the effect that the stockholders will pay the balance on a pro rata basis, if Ajax business during the period could not stand such a payment, does not have my sanction.

"As the present proposal reads, there is a possibility of a $20,000 cash settlement being offered Mr. Nerney. If any pro rata agreement as to the balance of the $16,000 is included in the offer, and if Ajax business in the future is such that the Company itself is unable to pay the balance, it would mean that I would have to hand over $8,000 in cash. That is, I understand that Mr. Nerney has insisted on some agreement on the part of the Ajax stockholders to pay his Company their pro rata share of the balance if the Ajax Company is not in a position to make this payment. Such an agreement does not appear

to be so unreasonable if the cash settlement is kept say around $12,000 or $8,000 as you originally proposed.

"In your conversation with me some weeks ago you intimated that if the Ajax Company could not pay the balance of the proposed settlement, it would be entirely optional on the part of the stockholders whether they would assume the payment of the balance, or lose their stock. Naturally, in the event of a $20,000 settlement, it would be very important that such an option be present.

"This is a matter which has worried me considerably since reading your letter."

There were four suits against the Ajax Company involving patent questions. One involved the alleged infringement of the Sauvage patent controlled by a Mr. Nerney upon freight cars operated by the New York, New Haven Railroad Company; the case was decided against the Ajax Company in 1934, which thereafter obtained a license from Nerney. He wanted $20,000 and a royalty of 40–50 cents per brake. Settlement was made for $15,000. The second Nerney case was designed to prevent cars owned by other railroads passing through interchange points of the New York, New Haven Railroad. Nerney also won this case in the lower court. The judgment was modified by the Circuit Court of Appeals but an accounting was ordered. There was another suit by Equipo Company for a declaratory judgment, and another action in Chicago by the Klasing Hand Brake Company.

When Mrs. Moore was on the witness stand I interrogated her regarding Exhibit "M". She first claimed the authorship of this letter; later she admitted having had some assistance from her son in its preparation. Subsequently, the plaintiff offered, and there was received in evidence, the original draft, all but the first paragraph of which proved to be in the handwriting of her son Robert, which convinces me that he not only had a fairly comprehensive idea of the business of the Company so far as the patents were concerned at least (a fact he at one time admitted but at another time disavowed) but that Mrs. Moore had in him a capable and dependable advisor.

It is incredible, since practically all of the conferences which Mr. Lee had with Mrs. Moore in relation to the sale of her stock took place in the presence of both of her sons, that she did not discuss the subject with her sons, certainly with Robert, and rely to a very large extent upon his judgment and advice.

As to the other exhibit (#EEE):

. Sometime prior to June 4, 1937, Mr. DeGuire had requested Mrs. Moore to execute an assignment of the license under which the Ajax Hand Brake was manufactured and sold. This license was granted by Mr. Burnett, the alleged inventor and patentee to Mr. Moore personally. Mrs. Moore was, or had been ill, and turned the matter over to Mr. McConnell who wrote Mr. DeGuire on June 4, 1937, as follows:

"From the file that has been turned over to me it is not clear just what interest the company has, if any, in this agreement. * * * *

"Some time ago, I had occasion to go over with her the terms and provisions of her contract with you with reference to the sale of her stock in order that her income tax position could be determined. I noted at the time that under that contract she had nothing but what amounted to an option on your part to buy her stock at a certain price, if, as and when you decided to exercise such option. As I remember, there was a definite time limitation on the option and she was afforded some protection by virtue of the fact that unless your notes were paid she could take down her stock. Regardless of whether or not she has any interest in the license agreement in question, I do not think Mrs. Moore would want to take the position that she had any further interest in this company or its business or its patents or the agreement under consideration if she was paid the balance of the purchase price for her stock. It seems to me that as long as the question has come up at this time with reference to the rights of the corporation in the license agreement with Burnett that it might be well to close up the whole matter by completing the purchase of her stock. I hesitate to advise her to execute any assignment so long as this stock purchase contract is unperformed, unless it is established that the corporation has a clear legal right to such license agreement."

There was evidence at the trial on behalf of the plaintiff that "the file" referred to in Defendant's Ex. EEE, did not contain certain documents which the plaintiff

testified had been given her by Mr. Lee during the negotiations in November and December, 1935, and which, after a cursory examination, and without being aware of their import, she had placed in her safe deposit box.

The plaintiff testified that it was not until sometime after December, 1937 (the date of the final payment), that her suspicions were aroused and she procured these documents from the vault and delivered them to Mr. McConnell.

I am satisfied that Mrs. Moore's primary interest at the time the letter of June 4, 1937, was written, was to obtain the balance of the installments not yet due under the contract and that at that time, and after proper advice, she was perfectly satisfied with the agreement.

I feel that the contention relating to the discovery of the purport of the documents in the vault is a mere afterthought and entitled to little weight.

The complaint must be dismissed upon the merits.

The attorney for the defendant should prepare, in accordance with this opinion, and submit to me through the Clerk's Office, findings of ultimate facts and conclusions of law as herein indicated, in pursuance of the requirements of Rule 52(a) of the Rules of Civil Procedure, following section 723c of Title 28 U.S.C.A.

Details of evidence are not to be submitted. Suggested findings of fact and conclusions of law shall be typed in triple space so that I may conveniently correct them if I wish to do so. The attorney for the defendant shall give 10 days' notice of the submission of such findings of fact and conclusions of law to the attorneys for the plaintiff and shall also submit a memorandum indicating the pages of the evidence, and the number of each exhibit upon which each finding proposed by him is based. The attorneys for the plaintiff may serve upon the defendant's attorney and submit to me, with proof of service, criticisms of the findings of fact and conclusions of law as proposed. Counter findings and conclusions by the plaintiff will be of no avail but she must take her objections, if any, by way of appropriate assignments of error, or by appeal. The defendant's attorney shall also serve with the suggested findings and conclusions, a proposed decree and notice of settlement.